[No. 1806.]

Gus Jones *v.* The State.

1. Manslaughter — Self-defense — Charge of the Court.— In charging the jury upon manslaughter the court twice instructed them, in substance, that if the defendant provoked the conflict with the apparent intention of killing the deceased, or doing him some serious bodily injury, the homicide would be murder and not manslaughter. Again, on the law of self-defense, the court charged that if the defendant provoked the conflict with the intention of killing the deceased, or inflicting upon him serious bodily injury, the homicide could not be justified by self-defense. *Held*, correct as abstract

propositions of law, but erroneous in view of the fact that the evidence shows that the deceased was the aggressor, and the persistent aggressor, throughout the fatal difficulty; wherefore the said charges were not only not warranted by but were contrary to the evidence.

2. SAME.— But, if justified by the evidence, the said charges would still be erroneous in so far as they apply to self-defense. If authorized by the evidence at all, the court should have further charged the rule that if the defendant provoked the conflict, but with no felonious intent, and with no intent to kill or to inflict serious bodily injury upon the deceased, and thereby brought about the necessity of killing the deceased to save his own life, or to prevent the deceased from seriously injuring him, while he would not be justified in committing the homicide, still he would not be guilty of murder, but of manslaughter.

3. SAME — SELF-DEFENSE.— It is a rule of law that if the evidence will warrant the jury to believe that, at the time the defendant fired the fatal shot, the deceased was making a violent attack upon him, under circumstances which reasonably indicated an intention to murder or maim, and the weapon used, and the manner of its use, were such as were calculated to produce either of these results, then the law presumes that the deceased intended to murder or maim the defendant, and that in such a state of case the homicide would be justifiable, and the jury should be so instructed in explicit terms.

4. SAME.— Upon the same subject, in this case, the court should have instructed the jury that if the conduct of the deceased, at the time of the homicide, was such, under the circumstances, as to reasonably produce upon the mind of the defendant the belief that the deceased was then about to kill or inflict serious bodily injury upon him, the homicide would be justifiable, although in fact the danger was not real, but only apparent. See the opinion on the question.

APPEAL from the District Court of Navarro.    Tried below before the Hon. L. D. Bradley.

On the 9th day of December, 1884, an indictment was filed in the district court of Navarro county, charging Gus Jones, the defendant herein, who is frequently referred to in the statement of facts as "Gus," with the murder of one Nat Williams, in Navarro county, on the 19th day of November, 1884. Defendant was arraigned and placed on trial for said offense, and pleaded not guilty to the indictment. The case was tried on the 7th day of January, 1885; defendant was found guilty of murder in the second degree, and his punishment assessed at twenty-five years' confinement in the State penitentiary.

H. C. Tolbert was the first witness for the State. He identified the defendant on trial as Gus Jones, and testified that he knew the deceased, Nat Williams, in his life-time. On the morning of November 19, 1884, the witness started to ride from the town of Dawson in Navarro county, Texas, to a point some distance in the country. When he reached a point on the edge of the town named, he heard

loud talking, quarreling and cursing, proceeding apparently from Nat Williams's house. Just as he looked towards that house, to see the occasion of the disturbance, he saw and heard a pistol shot. The defendant, Gus Jones, had the pistol in his hand and did the shooting. He was standing in Williams's yard in front of the door, and Williams was standing between him and the door. They were about ten feet apart. Williams had nothing in his hand at that time, but, on being shot, he turned, went into the house and returned with an ax and started towards the gate, but turned again and fell. Witness was about one hundred and fifty yards from the house of Nat Williams at the time of these occurrences. Inasmuch as he saw the ax in Williams's hand when he came out of the house after being shot, the witness feels quite certain that he could have seen it if Williams had had it in his hands when the shot was fired and before he went into the house.

Cross-examined, the witness stated that he was possibly two hundred yards distant from the house when the shot was fired. There was, however, no obstruction between him and the house, and he could see plainly all that transpired. Witness was west of the house, going north. The house faces south. The defendant was near the gate when he fired the fatal shot. After shooting the deceased, he turned out of the gate and walked off towards his own home.

J. A. Davis was the next witness for the State. He testified that he was the justice of the peace of the fourth precinct of Navarro county, Texas. He knew the defendant Gus Jones, and knew the deceased Nat Williams, in his life-time. On cr about November 19, 1884, witness was informed that the defendant had shot the deceased and was preparing to leave. Witness thereupon armed himself, summoned other parties, and went in pursuit of the defendant. Witness heard the pistol shot, and by stepping out of his office could see the place where the shooting took place. By the time Constable Sims and Mr. Jettow got ready to go with witness in pursuit, the defendant had secured a good start. Mr. Jettow about half pulled down the wire fence around the inclosure through which the defendant was fleeing, when the witness jumped his horse across it,. ran up to the defendant, and demanded his surrender, promising him the treatment of a prisoner. He made no reply, but struck an attitude and fired his gun at the witness. He then threw his gun away and commenced with his pistol. He would fire first and then retreat. After he commenced to fire the witness pulled his pistol and replied. Witness's pony would not stand still under fire, but

jumped from side to side. After the defendant had fired four times at the witness, he proceeded to reload. While thus engaged, witness rode up to him with his pistol presented and again ordered him to surrender. About this time Constable Sims arrived, and the defendant surrendered. Witness discovered that in loading his pistol the second time the defendant got it loaded irregularly,— that is, he left some of the old cartridge shells in some of the chambers. Nat Williams lived about two hours after he was shot. The ball took effect in the left side near the breast.

Cross-examined, witness stated that the deceased was not considered a dangerous negro, but would fight when the occasion arose. He had engaged in several fights to the witness's knowledge, but always with his fists and head. He was not quite so tall as the defendant, but was heavier in build.

S. B. Jettow was the next witness for the State. He testified that in the month of November, 1884, he was riding from the town of Dawson towards his home, when he saw several negroes at Nat Williams's house. When witness got within one hundred and fifty yards of Williams's house he heard loud cursing and talking. He then heard the report of a pistol, and heard some one say: "I will kill you, G—d d—n you, in your own yard." Witness saw Williams about the time the shot was fired, and knew that he had no ax in his hand. Witness was of opinion that the defendant did the shooting. Defendant was standing near the fence, about eight feet from the deceased, and inside of the deceased's yard. After he fired he passed out of the yard and went to his own house, which stood near. After Williams was shot he went into his house, turned around a few times, and came out with an ax in his hands.

Cross-examined, witness stated that he heard the shot and saw the smoke, but did not see a pistol. Williams did not go into the house and get the ax until after he was shot.

Matt Mathews was the next witness for the State. He testified that he and Anderson Williams went to Nat Williams's house to get dinner on the day of the homicide. Gus Jones was there, and he and the deceased were engaged in playing a game of "craps." When Anderson and witness got dinner they left the house to go to the railroad depot. The defendant and the deceased were then quarreling over a bucket of lard which defendant claimed to have won from the deceased. Deceased disputed that defendant had won the lard. Defendant told deceased that when he won anything he made it a point to have it. The deceased told him that he would not get the lard. He followed this up by declaring that he

was something of a man, and pulled off his coat. Defendant replied that he, too, was something of a man. The two parties were as yet in the house. Witness and Anderson went on, leaving them quarreling in the manner detailed. When they had proceeded about one hundred yards they heard the defendant and the deceased cursing and abusing each other violently, and witness remarked to Anderson that they would fight yet. Hearing the deceased order the defendant to get out of the house, they stopped and looked back, and saw the defendant go out of the house into the yard, sideways. Deceased followed him out, but had no ax that the witness saw. Witness heard the defendant tell the deceased he would kill him in his own yard, whereupon the deceased jumped from the door into the yard towards the defendant, and a pistol was discharged. Both parties were cursing violently. Deceased said: "Gus Jones, do you shoot me?" He then called for his pistol, went back into his house, and came out presently with his ax. Defendant went to his own house, a short distance off, loaded his gun and left. The defendant and deceased were two or three steps apart when the shooting occurred.

Anderson Williams testified, for the State, in almost the exact language used by Matt Mathews.

Jane Johnson testified, for the defense, that she saw the shooting of Williams by Jones. She was going from her house to the defendant's house, in doing which her road lay very near the deceased's house. As she passed that house she looked in and saw the defendant and the deceased playing "craps." She went on to Gus's house, and about the time she got there she heard loud talking and cursing at Williams's house, and started back in that direction. Gus came out of the house backwards, Nat Williams following him with an ax. He struck Gus in the breast with the back of the ax. Gus pushed him back and retreated backwards, still followed by the deceased, who struck at him twice more with the ax. As he struck the third time, the defendant drew his pistol and fired. Defendant had retreated nearly to the gate when he fired. He persistently attempted to ward off the ax with his hand, and deceased as persistently tried to strike him with it. Gus did not have his pistol in his hand when he first came out of the house. Witness was very near the parties at the time, and saw the whole of the transactions immediately attending the homicide.

On her cross-examination the witness stated that the defendant was her son-in-law. Deceased did not let go of the ax until he fell. When Williams first struck defendant, witness called to defendant

to come out of the yard. After he was shot, Williams called to Gus: "You blood-thirsty devil, I'll get you yet." He then called for his pistol and started into the house, but his wife would not let him in. The defendant made no threats against Williams before the shooting. The houses of the defendant and deceased were about three hundred yards apart.

Re-direct examination, the witness said she did not know how far three hundred yards was, but supposed it to be about the distance across the court room. Otherwise she repeated some of the statements of her examination in chief.

Lee Jones, the wife of the defendant, testified that she was standing by her mother, the last witness, and saw the shooting. She was attracted to that place by the quarreling and cursing. She heard Williams tell the defendant to get out of his house. Defendant came out of the house backwards, followed closely by deceased with an ax. Deceased struck him once in the breast with the ax, and struck at him twice more with it. As he struck the third time, defendant, who had been backing and warding off the blows, drew his pistol and shot the deceased, jumped the fence, and went home.

Charlotte Williams, the wife of the deceased, testified, for the defense, that she was not at home when the quarrel between defendant and deceased commenced, and she did not know what it was about. When she got home the two were in the house cursing and abusing each other, and Williams had his coat off. He ordered the defendant out of the house. Defendant drew his pistol as he went out, and said: "G—d d—n you, I will kill you in your own house." Deceased followed him out with his ax in his hand, hanging down by his side, and cursing the defendant. He made no effort to strike the defendant that witness saw, but was going towards him with the ax when the defendant shot him. After shooting deceased, the defendant jumped the fence and went home. Just before the shot was fired, witness told Gus to get out of the yard and not shoot there. He replied: "No, G—d d—n him, I will kill him." Witness did not say after the killing: "Now that Nat is dead, I am as free as any other woman."

Ed. Washington testified, for the defense, that he had known the deceased and the defendant for ten or eleven years. The deceased had always borne the reputation of a dangerous and violent man. He was a man when the defendant was a boy. To the witness's certain knowledge, the defendant had known the deceased for many years.

The motion for new trial presented the questions discussed in the opinion.

*Harris & Lee*, for the appellant.   We think as an abstract prop-
osition of law that the eighth charge is correct, but we cannot see
wherein it has any application to the case at bar.   Upon a close in-
spection of the statement of facts we fail to find any testimony
establishing, or tending to establish, the fact that the defendant pro-
voked or brought about the difficulty which terminated so seriously.
If that is true, viz.: that the record discloses no evidence from
which a conclusion of that kind can be formed, we submit, then,
that his Honor erred in giving any instruction based upon the sup-
posed existence of such testimony.   Should the court from all the
statement of the facts, taken and considered together, be of the
opinion that there is testimony supporting the supposition that
the defendant brought about the difficulty or voluntarily engaged
in the difficulty with the deceased, we submit, with all due defer-
ence to his Honor's ruling, that the instruction is erroneous because
it charges the law applicable to cases only where the difficulty is
brought about by a defendant with a fixed and felonious intent,
formed and existing in the mind at the time, and fails to charge the
law applicable to cases where a defendant provokes or brings on a
difficulty without any felonious intention.   In support of this argu-
ment we refer to 1 Texas Ct. App., 513–17; 7 Texas Ct. App., 493;
and 40 Texas, 200.

The charge of the court is objectionable for the same and other
reasons in giving the charge on self-defense.   In the first por-
tion of the tenth charge his Honor limits the right of self-defense
to those cases where it is actually necessary to kill in order to save
life or protect one's person from serious bodily injury, and it is nec-
essary that it should appear, says the learned judge, " by the acts, or
by the words coupled with the acts, of the person killed that it was
his intention to kill the person killing, or do him serious bodily in-
jury."   A jury in considering this portion of said charge are liable
to be misled for obvious reasons.   With such a charge before them
while in the jury room cool and calm, nothing before them save the
testimony and the law as given by the court, nor anything to excite
their minds, they survey the testimony in their quiet manner and
come to the conclusion that the defendant could have saved his life
and saved himself from serious bodily injury without retreating and
without the shedding of blood.   The jury simply say that it now
does not appear to us that it was necessary for the defendant to
have killed the deceased.   The court will observe that the words
" necessary, and appear to be necessary," are not limited by any
other words whatever, save further on where in said charge his
Honor says "that it makes no difference whether the danger was

real or imaginary if it had the actual appearance of being real."
Appearance to whom? Must the evidence be of such a character
that it will, when given to the jury, convince them "that it was
necessary to kill, or that the acts, or the words coupled with the acts,
of the person killed" were of such a character as to make it appear
to the jury that it was necessary for the defendant to have killed
the deceased? Is that what the jury are to determine? Or must
the jury inquire as to how it may have reasonably appeared to the
defendant at the time and under all the circumstances, considering
his mental excitement, and the manner in which the difficulty was
brought about?

Should the court take this latter view of the case, which we think
is correct, we submit that there is a great probability that the jury
were misled by this portion of said charge. We think that his
Honor should have added the word defendant after the word appear
in this charge. We leave this proposition by referring the court to
Horrigan & Thompson on self-defense, pages 703 and 731, and
7 Texas Ct. App., 493, and cases cited. His Honor proceeds, further
on in the tenth instruction, to repeat that portion of the eighth
charge already complained of, and to which we interpose the same
argument. This is the third time that "if the defendant provoked
the difficulty," etc., has been used by his Honor. This has been
repeated and kept before the jury so prominently that it is not
at all likely that the jury will ever forget it. Doubtless they
have received the impression from the court that the defendant
did bring on the difficulty with a felonious intent. We beg leave
to say here that the statement of facts herein should disclose
that the defendant Gus Jones did go to the house of Nat Williams,
the deceased, and bring on the difficulty with a felonious inten-
tion formed and existing in his mind at the time to kill the de-
ceased, or that this portion of said charge should not have been
given, and that, having been given independent of any other hy-
pothesis but that of a felonious intent, the jury in directing their
inquiry never for once considered "that if the defendant did bring
on the difficulty or voluntarily engage in it, but without any felo-
nious intent," what the consequences would be if such was the case.

We have another serious objection to the charge of his Honor in
this case, and that is that the evidence of the witnesses for the
defendant seem to have been partially, if not entirely, ignored in
giving the law to the jury. This court has repeatedly held that it
is the duty of the trial judge to instruct the jury upon every issue
presented by the evidence in felony cases, whether asked or not.

Is there any instruction based upon the supposition that if the deceased was armed with an ax or other deadly weapon, and was making an attack or advancing upon defendant at the time the fatal shot was fired, what the jury should do in the event that they should believe that such was the case? Every witness present, even the deceased's wife, testifies that deceased was armed with an ax going towards defendant, was angry and enraged at the time he was shot, and two of them testify that deceased was using the weapon. These witnesses were on the spot, where they could see every act and hear every word on that eventful occasion, yet there is not an instruction based upon the existence of such a state of the case anywhere submitted to the jury. This evidence was contradicted. Whom was it contradicted by? It was contradicted by witnesses that were from one hundred to two hundred yards from the scene of the difficulty. While it was contradicted it was mostly by negative testimony. While this is the case his Honor in his charge seems to have lost sight of the testimony of defendant's witnesses almost entirely, and instructed from beginning to end supposing the defendant to have raised the difficulty with a view of killing the deceased. This having been done by his Honor, we can readily conceive how easy it was for the jury to place their minds upon and direct their inquiry to that portion of the testimony upon which his Honor framed the charge. We submit to the court that if the proper instruction in this case had been given the defendant could not have been found guilty of any offense higher than manslaughter. It is a lamentable fact that judges so often do in their charges give so much prominence to some things while others are ignored. The jury in trials of this magnitude not only watch the testimony but even notice closely and critically every action of the court, and when the testimony is all before them they listen closely to the charge, and should the trial judge neglect to present instructions upon any part of the testimony the jury are more than likely to follow in the same channel, thinking thereby that that portion of the evidence neglected in the charge is not important or is untrue.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. In charging the law applicable to manslaughter the learned judge twice instructed the jury, in substance, that if the defendant provoked the conflict with the apparent intention of killing the deceased, or doing him some serious bodily injury, the homicide would be murder and not manslaughter. Again, in charging the law of self-defense, he instructed the jury that if the defendant

provoked the conflict with the intention of killing the deceased, or of inflicting upon him serious bodily injury, the homicide could not be justified by self-defense. These instructions are abstractly correct; but it is insisted by counsel for the defendant that they are not warranted by the facts of the case; that there is no evidence showing, or tending to show, that defendant provoked the contest which resulted in the homicide.

After a careful consideration of the evidence as it is presented to us, we are of the opinion that it does not justify these charges. The quarrel began in the deceased's house, about a bucket of lard which the defendant had just won of the deceased at a game called "*craps.*" Deceased pulled off his coat to fight the defendant, and ordered him to leave the house, and defendant backed out of the house, followed by the deceased, who was armed with an ax, with which he was striking at the defendant. This is the testimony substantially of defendant's° witnesses, who were present in and near the house and saw what occurred in the house. There is no evidence which contradicts the defendant's witnesses as to how the conflict originated in the house, and according to these witnesses the deceased was the aggressor from the beginning, and not only provoked the conflict, but forced it upon the defendant by following him with a deadly weapon when he was leaving the house in .obedience to the deceased's order to leave. These charges were not excepted to at the time of the trial, but were objected to in a motion for a new trial. In our opinion, the error committed in giving them is a material one, and was well calculated to injure the rights of the defendant, and for such error the conviction must be set aside.

But we might concede that the charges named were justified by the evidence, and still they would be erroneous in so far as they applied to self-defense, in not further instructing the jury that, if the defendant provoked the conflict, but without any felonious intent, such provocation would not have the effect to deprive him entirely of justification or mitigation under his plea of self-defense. If the defendant provoked the conflict, but with no felonious intent, with no intent to kill the deceased or to inflict serious bodily injury upon him, and thereby brought about the necessity of killing the deceased, to save his own life, or to prevent the deceased from inflicting upon him serious bodily injury, while he would not be justified in committing the homicide, still he would not be guilty of murder, but of manslaughter. (*Cartwright and Nash* v. *The State*, 14 Texas Ct. App., 486; *King* v. *The State*, 13 Texas Ct. App., 277.)

Again, we are of the opinion that the charge of the court upon the law of self-defense is materially defective in other respects. If the jury might believe from the evidence that, at the time the defendant fired the fatal shot, the deceased was making a violent attack upon him under circumstances which reasonably indicated an intention to murder or maim, and the weapon used, and the manner of its use, were such as were calculated to produce either of those results, then the law presumed that the deceased intended to murder or maim the defendant, and the jury should have been so instructed in explicit terms (Penal Code, art. 571; *Kendall* v. *The State*, 8 Texas Ct. App., 569), and that in such state of case the homicide would be justifiable. Furthermore, upon this subject the charge should have instructed the jury that if the conduct of the deceased at the time of the homicide was such, under the circumstances, as to reasonably produce upon the mind of the defendant the belief that the deceased was then about to kill or inflict serious bodily injury upon him, the homicide would be justifiable, although in fact the danger was not real but only apparent. The questions in such cases for the jury to determine, and which should be clearly and distinctly submitted to them, are, what was the state of defendant's mind, and under what influence did he act in committing the homicide? Did it reasonably appear to him that he was then about to be killed or seriously injured by the deceased? In the particulars we have mentioned we think the charge of the court was not as liberal to the defendant as it should have been. (*Cartwright* v. *The State*, 16 Texas Ct. App., 473; *Smith* v. *The State*, 15 Texas Ct. App., 338; *Jordan* v. *The State*, 11 Texas Ct. App., 435.)

We will not consume time in the discussion and determination of other errors insisted upon by defendant's counsel, because they are not likely to occur in another trial.

Because of the errors in the charge of the court, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered March 7, 1885.]